The People of the State of New York, on Complaint of Morris Goldberg, Complainant, *v.* B. M. Reeves, Inc., Defendant.

Municipal Term of Court of Special Sessions of New York, Borough of Brooklyn, May 25, 1938.

*William C. Chanler, Corporation Counsel [Francis J. Bloustein, Assistant Corporation Counsel, of counsel], for the People.*

*Leo B. Mark, for the defendant.*

Bromberger, C. M. The defendant corporation is engaged in the business of importing, processing and packing fruits, operating its plant at 254 Thirty-sixth street, Brooklyn, N. Y. On October 23, 1937, the complainant, an inspector of foods in the department of health, inspected the defendant's premises and discovered among or adjacent to wholesome foodstuffs of similar brands and character respectively, some 389 pounds of various edibles, consisting of dried dates, dried figs and canned pineapple slices, which were mouldy, contaminated with dirt, decomposed or otherwise wholly unfit for human consumption. It is this quantity of foodstuffs which forms the basis of the instant prosecution.

More specifically, twenty-five seven-pound twelve-ounce cans of pineapple slices in a swollen and bulging condition, indicating decomposition of their contents, were on a movable platform among a considerable quantity of unswollen, sound cans containing wholesome merchandise of like character and of the same brand. All the cans were alongside the mechanical can-opener where the primary operation of opening the cans preparatory to processing this par-

ticular fruit occurs. The defendant claims that immediately prior to the time of the inspection, the entire quantity of canned pineapple slices had been brought up from its storeroom, where it had been kept in stock since its delivery at the defendant's premises some eight months previously; that at the time of the official inspection, these cans were awaiting examination by a plant foreman preparatory to processing their contents; that its usual procedure, upon such examination, was to eliminate cans found to be swollen and bulging and, by the use of CN, to destroy their contents.

The dates in question, some 175 pounds in weight, were found mixed with rodent excretion in wooden boxes under work benches on the same floor as the pineapples. The defendant contends that these dates were rejects from wholesome, sound dates and had been thrown into discard by the girls employed in sorting them. This is sustained to some extent by the testimony of the inspector on cross-examination, to the effect that, on top of the work benches, there were other clean boxes of similar type containing only wholesome dates.

The circumstances relative to the figs are somewhat different. The defendant does not process or otherwise prepare the figs but merely imports them for resale either in the original packages or occasionally repacked where the figs are unsightly. The defendant testified that for the same reason of sightliness, in some instances it heats the figs to remove excess surface sugar; however, that does not appear to be a customary procedure generally or invariably followed by it. At the time of the inspection there were a substantial number of eight-ounce packages of figs near the elevator shaft. The inspector, breaking their cellophane wrappers, discovered mouldy figs mixed in the same packages with wholesome ones. There is no evidence that these were to be processed or re-examined. The defendant's testimony in regard to them is exceedingly weak and unconvincing. The plant foreman testified that these packages had been examined and found unwholesome and had been stacked near the elevator ready to be disposed of by dumping them into cans to be brought up from downstairs. On the other hand, the inspector testified that the mouldy and unwholesome figs were mixed with healthy ones and that he had broken the cellophane wrappings before discovering the bad among the good product. It should further be noted in this connection that defendant's counsel in his trial memorandum (p. 5) claimed that these packages of figs had been returned for credit by one of the defendant's customers and were awaiting examination at the time of the inspection to determine if the credit allowance should be granted. The record fails to disclose any testimony to substantiate

this contention and the defendant is thus apparently adopting conflicting explanations with respect to the figs and, in its memorandum submitted to the court at the trial, one entirely at variance with the testimony as subsequently developed in the record.

It does not appear that the explanations now urged at the trial with respect to this merchandise were vouchsafed by the defendant at the time of the inspection. According to the inspector's testimony, the explanation then offered by the plant foreman was that there had been a " strike " in the defendant's plant and that the merchandise had been left by the workmen, at the time they quit their employment, in the condition in which the inspector discovered it.

The foodstuffs were not marked, denatured, or, except in the case of the dates, physically separated or segregated from wholesome products of similar character held or stored by the defendant as disclosed in the record. Further, all the unwholesome merchandise here involved was on the floor used by the defendant for the preparation and processing of its foodstuffs and had been brought up, in the case of the pineapple slices, from its storeroom on the floor below.

That these foodstuffs were not " healthy, fresh, sound, wholesome or safe for human food " is not open to question. The unwholesomeness of these products, to the extent here at issue, was not challenged by the defendant and may be accepted as a recognized fact.

We are then left with the question as to whether the testimony presented affecting any of these various foodstuffs justifies a conviction under section 163 of the Sanitary Code of the City of New York (N. Y. Code of Ordinances, chap. 20, art. 9, § 163). So far as it is material here, this section provides: " No meat, vegetables or milk not being then healthy, fresh, sound, wholesome or safe for human food * * * shall be brought into the City of New York or held, kept, offered for sale or sold as such food or kept or stored anywhere in the said City." The provisions are in the disjunctive and not in the conjunctive and the foodstuffs here involved come within the purview of this section.

The defendant claims that, to sustain a conviction under that section, evidence of an intent to sell the unwholesome foodstuffs must be adduced as an integral part of the People's case. The prosecution contends, *first*, that under the regulatory provision, no such intent need be shown; and, *second*, that if such an intent is a necessary element, that, by reason of section 138 of the Sanitary Code, a presumption of intent to sell arises from mere possession.

It is both surprising and unfortunate that at this late date in the history of the provision here under consideration, there should

be uncertainty as to its exact interpretation and purport. Further, it is quite apparent to me, in the light of historical development and subsequent experience, that there is a misconception and misinterpretation of certain decisions of the appellate court of this department involving bad foodstuffs, and an attempt elastically to expand and extend them beyond what, in my opinion, truly and logically represents their reasonable limitations. Those charged with possessing or selling unwholesome food products or offering them for sale, have seized upon those determinations as a " datum, a point of departure " from which to evolve a general rule of law which as I shall presently illustrate is contrary to what I conceive to be the proper legal concept and opposed to the public interest. This compels a re-examination of the law at some length in an endeavor possibly to establish a rule and standard which may preclude further misconceptions of the provisions now under consideration or interpretations unjustified by law and too fluid for the public good in their attempted application, under claimed sanction of decisions of the appellate courts.

The very company whose cases have been utilized as the foundation and cornerstone upon which a defensive structure has thus been erected by those found in possession of unwholesome products, itself recently pleaded guilty to a like charge involving unwholesome dried figs, restricting its plea, however, on the record, to the unwholesome edibles found on its sales counter in a store serving 5,000 persons daily, and seeking to exclude from the implications of that plea, under the decisions of the appellate courts in its favor in some prior litigations, those unwholesome figs of the same character, brand and packing found amongst similar wholesome product in its stockroom and from among which those found on the sales counter were undoubtedly withdrawn for public sale. (*People* v. *Woolworth*, Municipal Term, Part II, May 18, 1938.)

Experience would seem to indicate, therefore, as thus instanced, that the security of the public health and its protection from the menace of infection through contaminated food, cannot possibly rest secure with that degree of assurance which the public interest commands, upon any claimed procedure of examination by the possessor of such foods, intermediate the stock or storeroom and the sales counter.

I am adverting to this case, not as affecting my conclusion in the slightest degree in the instant prosecution upon the facts before me, but as an instance, among many others, in my experience as the tribunal of original jurisdiction in cases of this character, of prosecutions affected by the claimed interpretation of the recent adjudications in the appellate court.

A great jurist has observed that " the life of the law has not been logic; it has been experience " (Holmes, The Common Law, p. 1); and again, " a page of history is worth a volume of logic " (*New York Trust Co.* v. *Eisner*, 256 U. S. 345, at p. 349).

An equally eminent legal scholar and recognized juridical authority, who has directed attention to the immediately preceding observations, remarks (Cardozo, The Nature of the Judicial Process, p. 48): " The implications of a decision may in the beginning be equivocal. New cases by commentary and exposition extract the essence. At last there emerges a rule or principle which becomes a datum, a point of departure, from which new lines will be run, from which new courses will be measured. Sometimes the rule or principle is found to have been formulated too narrowly or too broadly, and has to be reframed." He has further pertinently observed (Id. p. 66): " The final cause of law is the welfare of society. The rule that misses its aim cannot permanently justify its existence."

The Court of Appeals has clearly indicated its liberal interpretation for effective enforcement of a penal statute involving " the public good " in *Luetchford* v. *Lord* (132 N. Y. 465, at p. 469): " The statute against betting and gaming was enacted as a protection of the public morals. The intention of the Legislature was to discourage and repress gambling in all its forms, and the law under consideration, having been enacted for the public good, is to be construed so as to accomplish, so far as possible, the suppression of the mischief against which it was directed. (*Ruckman* v. *Pitcher*, 1 N. Y. 396; *Storey* v. *Brennan*, 15 id. 527.) "

With slight change this observation might readily and aptly be paraphrased to apply precisely and pertinently to the instant prosecution.

Under section 558, paragraph a, of the Charter of the City of New York, a derivative of section 1172 of the former charter, the Sanitary Code in effect on the date at which the present charter took effect and all' existing provisions of law fixing penalties for its violation and all regulations of the board of health on file with the city clerk on that date, are continued binding and in force except as amended or repealed from time to time; and such Code is therein specifically declared to have the force and effect of law.

Under section 558, paragraph b, power is vested in the board of health, from time to time, to add to and to alter, amend or repeal any part of the Sanitary Code and to publish additional provisions for the security of life and health in the city and confer additional powers on the department of health not inconsistent with the Constitution and law of the State or with the charter; and power

is further vested in the board to provide for the enforcement of the Sanitary Code or any orders made by the commissioner or the board of health, by such fines, penalties, forfeitures and imprisonment as may be prescribed therein or otherwise provided by law.

Section 558, paragraph d, a derivative of section 1262 of the prior charter, constitutes violations of the Sanitary Code as misdemeanors.

This then brings us to a review of section 163 of the Sanitary Code with which we are here directly concerned. As early as 1873 the then Sanitary Code (§ 42) contained provisions relative to bad and unwholesome foods. The section corresponded more generally in its provisions to section 137 of the Sanitary Code rather than to section 163, under which this prosecution has been instituted.

However (in 1901), section 42 was drastically amended so that its language is substantially that of the present provisions of section 163. It then provided: " No meat, fish, eggs, birds, fruit, vegetables or milk not being then healthy, fresh, sound, wholesome and safe for human food * * * shall be brought into the City of New York or offered or held for sale as such food anywhere in the said city, *nor shall any such articles be kept or stored therein.*" (Italics ours.)

This section was re-enacted in 1913 substantially without change, although a semi-colon was then substituted for the comma preceding the last clause which I have italicized.

When renumbered as section 163 in 1914, it remained intact save that in place of the clause " nor shall any such food, substance or articles be kept or stored therein," the phrase " or kept or stored, anywhere in said city," was substituted and separated by commas from the prohibition which preceded it.

In 1928, by amendment, the section emerged in its present form and subsequently by filing with the city clerk is effective under the present charter.

Apropos of these regulations, it may be pertinent to direct attention to regulation 27 of the regulations of the board of health, which prescribes the frequency with which food which has become unfit for human consumption is to be removed and the method of its segregation, removal and destruction, as follows: " Food or drink, which has become unfit for human consumption, shall be kept separate and apart from other foodstuffs which are held, kept, and offered for sale, properly denatured, marked ' condemned ' and removed daily."

In view of the history of section 163, it is my opinion that the intendment was clearly to outlaw any keeping or storing of unwhole-

some foodstuffs by a dealer in such commodities and that it was wholly immaterial whether the People adduced evidence of intent on his part to sell or dispose of them to the consuming public. This view of the section as presently effective is further emphasized by regulation 27, which provides for a method of segregation and daily destruction of bad foodstuffs.

Various of the numerous defendants who have appeared before this court in cases of this character, including the present defendant, have sought to employ the decisions of the Appellate Division in this Department in *People* v. *Woolworth* (2 cases, 246 App. Div. 838; 250 id. 864) in support of a general rule that an intent to sell is an integral part of the People's case and that such intent must there be established to sustain a conviction under section 163. A perusal of the records in the *Woolworth* cases and of their memoranda decisions, satisfies me that the appellate court in reversing those convictions had no intention of effectuating any such broad rule now urged in pressing those cases upon this court. I am satisfied that this attempt is conferring an elastic quality to those cases never contemplated by the appellate court, knowing, as it undoubtedly does, the difficulties besetting an effective enforcement of these measures so vital in their importance to the protection of the hygienic security of the community. The court had before it in the *Woolworth* cases specific facts which, incidentally, are not analogous to those before this court in the instant prosecution; and the court there applied the law to those specific facts. In my opinion, those cases represent the appellate court's limit of liberality toward a purveyor of food who, carelessly or intentionally, possesses, stores or holds unwholesome edibles.

It must be recognized that we are here dealing with matters vital to the health and even the lives of our citizens and neighbors, if not, indeed, our own families. Those who deal in food products must realize that the highest degree of responsibility rests upon them for the wholesomeness of their product; for its fitness for human consumption; for its freedom from adulteration; and for its full compliance with the established and recognized standards of weight and quality. It is no answer to the tortures of infection which may be suffered by unsuspecting members of the community who may trustingly have eaten or imbibed unwholesome food products in complete reliance upon the protective assurance of the statutory regulations, to say that " reasonable " precautions had been taken to guard against the distribution or sale of the offending article; nor is it much solace to families where fatalities may have occurred by reason of the same cause, to advise them that the use or sale of the bad food had been effected unfortunately

or erroneously and had never been intended by the dealer. Neither can we find much comfort in the thought that the responsible offender may be penalized after the effects of his negligence, to put it mildly, in some instances have manifested themselves in concrete cases, or, perhaps, that he be not penalized at all due to the practical impossibility in many situations of discovering the offending cause, or, even if it be discovered, of tracing its source and origin.

It may well be true, as urged by the defendant, that *mere possession* of bad food, in and of itself, may not be deleterious to the health of the community. We are not here concerned alone with the actual sale or distribution of bad foodstuffs but with the possibility that such foodstuffs may be sold or distributed, intentionally, negligently or erroneously, through their availability for such distribution on the part of their possessor.

In my opinion, in order to escape penal liability, it must definitely and unequivocally appear on the part of a concern found in possession of bad foodstuffs, that there existed no reasonable possibility of the use of the merchandise either intentionally or otherwise.

The rule, as I have indicated above, is that which I understand the Appellate Division of this Department to have evolved in its decisions in the *Woolworth* cases (*supra*). This view, as I see it, is supported by the recent decision of that court in *People* v. *Sweet Life Food Corporation* (still unreported officially, N. Y. L. J. March 11, 1938). The rule indicated presupposes, for example (but not establishing this as an authoritative procedure or practice), an examination of foodstuffs apart from the place where wholesome products are being processed, stored or shipped; the prompt, unquestionable and complete segregation of unwholesome foodstuffs in places actually and physically apart and separated from those where wholesome products are kept, processed or shipped; clear marking and notation of their unwholesomeness and unfitness for use or sale; and their prompt destruction in accordance with the provisions of section 148 of the Sanitary Code and the prescribed regulations, especially of regulation 27.

While this may place a burden upon the dealer in foodstuffs, it is only consistent with the exigencies and necessities of the problem, and is compellingly demanded by the public interest. It is a proper and essential corollary of the police power of the State.

Judge CARDOZO has observed (Nature of the Judicial Process, p. 85): " It was long ago held by the Supreme Court that the Legislature has power to control and regulate a business affected with ' a public use.' It is held by the Supreme Court today that there is a like power where the business is affected with a ' public

interest.' " (Citing *German Alliance Ins. Co.* v. *Kansas*, 233 U. S. 389.) 'Thus the business of fire insurance has been brought within the category of a public interest. The sale of coal where emergency of war or dislocation resulting from war brings hardship or oppression in the train of unfettered competition, has likewise been brought within that classification. Instances may further be cited of other industries likewise affected. There is no higher " public interest " than the health and safety of the community, which can so readily be affected by the nature and quality of its food and drink.

Those charged by law with legislative or public administrative responsibility, particularly that of protecting health and safety, should be permitted, within broad and fundamental legal limitations, to adopt and to prescribe the laws or regulations, their extent and modifications, deemed by them requisite competently to discharge their public obligation. If the rules and regulations thus formulated by them are too narrow, or impracticable, recourse should be directed to those engaged in that public service and who are provided, at public cost, with the expert knowledge and facilities for surveys and research satisfactorily to determine those facts with due and complete regard to " the welfare of society " and " the public interest."

I realize full well the complexities of administering a large business enterprise and the possible added expense which may be imposed, for instance, by separate examination rooms, frequent inspection of the foodstuffs stored in the premises, and other necessary and essential precautions to guard in the highest degree against retention of contaminated foods and to effect their daily destruction. However, as between the imposition of these burdens as incidents to conducting a business of this character so fraught with public interest, and the risk inherent in the distribution or availability for distribution of bad foodstuffs, there can be but one choice. As I have indicated above, I am satisfied that the intendment of section 163 of the Sanitary Code was to rivet responsibility upon the possessor of bad foodstuffs without requiring proof of intent to use or to sell them. This view is emphasized by the enactment of regulation 27 and by the context of other sections of the Sanitary Code, promulgated by the same authority, wherein possession with intent to sell is indicated when the mere possession is not in and of itself intended to fasten liability. As an instance, section 124 of the Sanitary Code provides: " No person shall sell, offer for sale, give away, deal in, or supply, or *have in his or her possession with intent to sell* * * * any article of food or drink or any

medicinal or toilet preparation, intended for human use internally or externally, which contains any wood naphtha." (Italics ours.)

But even were intent by the possessor to use or to sell the foodstuffs outlawed by the Sanitary Code required, such intent is logically and legally deducible and presumed in the first instance, from the fact of their possession by one engaged in the food or produce business, particularly where such foodstuffs are among good and wholesome product.

This presumption might be overcome by proof of compliance with or observance of those regulatory provisions of the Sanitary Code governing the segregation, marking, removal and destruction of such merchandise.

Any other interpretation would nullify the value of the sanitary laws and regulations achieved after long struggle and leave " a statute without meaning, a futile and deceptive gesture " (*Campbell* v. *City of New York*, 244 N. Y. 317).

In *People* v. *Kibler* (106 N. Y. 321, at p. 324) the court observes: " It is notorious that the adulteration of food products has grown to proportions so enormous as to menace the health and the safety of the People. Ingenuity keeps pace with greed, and the careless and heedless consumers are exposed to increasing perils. To redress such evils is a plain duty but a difficult task. Experience has taught the lesson that repressive measures which depend for their efficiency upon proof of the dealer's knowledge and of his intent to deceive and defraud are of little use and rarely accomplish their purpose."

The interpretation indicated is, I am satisfied, consonant with the decisions of the Appellate Division in the *Woolworth* cases. The court there did not decide or hold that proof of intent to sell the unwholesome product constituted an integral part of the People's case. The appellate court, as I view it, merely absolved the defendant from penal responsibility where the specific facts in those instances established in the court's opinion that the product could not reasonably have been sold to or reached the public. Yet, even the defendant in those cases, as I have disclosed (*supra*), has lately revealed a course of conduct in its operation which, had it been known to the appellate court, might have resulted in quite a contrary view of those same facts.

Those dealing in foodstuffs, whether as the primary, intermediate or final sources of distribution, are virtually fiduciaries of the public health in connection with the merchandise in which they traffic. They alone know or have the means of ascertaining the facts concerning the wholesomeness, soundness, healthfulness, freedom from adulteration and the weights and qualities of their

product. The purchasing and consuming public virtually relies upon that responsibility in effecting its purchases of edibles and rests with assurance upon the completely adequate safeguards provided by the board of health and other legislative and administrative authorities for its protection, and in the belief that the courts, realizing the vital importance of those safeguards and the potential dire consequences of any laxity in their enforcement, will rigidly uphold and effectuate them. This court would indeed be assuming a grave role were it to whittle down, modify or relax those established protective measures by juridical interpretation, tantamount to judicial legislation; and to do so it would thereby be substituting the court's responsibility in the efficacy of enforcement for that of the departmental or administrative authorities vested under the law with the power of compelling compliance with its provisions and charged with the duty of adequately securing the public against contaminated foodstuffs.

It should further be pointed out that section 163 of the Sanitary Code, coupled with its strict enforcement, is salutary not only to the public, which it is primarily intended to protect, but to the honest and ethical dealer in foodstuffs as well. While he may on occasion fall within its prohibitions through carelessness or oversight, he is the better protected, in the final analysis, by rigid enforcement, from the unfair and dishonest competitors who might otherwise foist unsound and unwholesome food products upon an unsuspecting public at prices which the honest merchant could not profitably meet and then, by the same excuses now urged upon the court here, avoid responsibility and escape punishment.

I have dwelt thus at length upon this problem because of its importance; because of the frequency with which the issue here discussed arises in this court; and because of what I view to be a misconception of the appellate court's determinations and their attempted misapplication in practice.

The case before me presents no doubt in my mind on the facts; and indeed, even had I chosen to accept the defendant's test of " intent to sell," its motion to dismiss would necessarily have been denied as the proof adequately establishes defendant's possession of the figs alone here involved and of the pineapples, sufficient adequately to satisfy any interpretation of the law, however liberal such interpretation might be to the defendant.

Defendant's motion to dismiss is denied. Upon the entire evidence I find the defendant guilty as charged. The imposition of penalty and sentence is reserved to give both the prosecution and defense an opportunity to be heard thereon.