Raymond L. Wilkes, J.
To paraphrase a fine old Greek adage, “ Law is the gift of men but living under law is the course of wisdom.” We will, in due course, determine the manner in which this so prescient suggestion applies to the cause at bar and whether or not an historic aphorism is to be redressed so as to read, “ let the seller beware.”
Few things seem so perennially present in our lives— so free of care in their packaged neatness — so unlikely to shape destiny — as the butter on the supermarket shelf. But now, from behind this benignly impressive fascade of cool gentility emerges a problem for this court to consider, namely: When is a pound of butter to be pound of butter to be a pound of butter?
Is butter to be proper poundage at the plant of the packer (who cuts and packages) —at the warehouse of the dealer (who purveys to the retailer) — or at the store of the retailer (who offers it for sale to the ultimate consumer) ? Must the promise of a pound purchased bear a reasonable resemblance to the reality, and, if it does not, where is the repository of responsibility under law? May the retailer,' so to speak, “pass the butter ” to the packer or the dealer, and if not, will it necessarily lead to “ apocalypse in the supermarket ”?
On August 23, 1966, a meeting was called by the County Sealer (Commissioner of Weights and Measures) of Nassau County, which was attended by representatives of the defendants as well as by those of virtually every other major supermarket in the County of Nassau. During the course of that gathering, which was presided over by one, Robert Williams, the County Sealer, all who attended signed an attendance sheet, (People’s Exhibit No. 1), indicating the firm he represented and his official relationship thereto. Mr. Irwin Tantleff attended as president of the defendant, One Eleven South St. No. 2 Inc., doing business as Food Town and signed the roster, ‘ ‘ Pres. Food Town-Oyster *141 Bay.” Mr. Irving Cohen signed as, “Dairy Big Apple,” in behalf of the defendant, Big Apple Supermarket, Inc. The requests to attend were contained in a letter from the County Sealer dated August 16, 1966, addressed to various stores.
In a decision of this nature, the court would not ordinarily “ marshall the testimony ” at length, but in its judgment, doing so finds ample warrant in the somewhat general import of the questions being determined.
The Testimony
The first witness in behalf of the People during this consolidated trial was Irving Cohen, who testified in sum that he was employed by the defendant Big Apple as a supervisor and that he recalled having attended a meeting at the Nassau County Department of Weights and Measures in 1966, during the course of which he was advised about shortweight butter in Nassau County, and that he relayed this information to his employer.
The People then called Irwin Tantleff who identified himself as president of the defendant 111 South Street No. 2 Inc., doing business as Food Town, Oyster Bay. He testified that he attended the same meeting and that there was an inference by the spokesmen for the county that they were going to concentrate at the retail store level on the subject of short-weight butter. He stated that he was apprised that the reasons for short-weight were shrinkage and the practice of the packer in cutting butter on the pound. He further testified that the defendant Food Town is an independent store, not a chain, and that it was suggested he make certain that the butter in the store be a full pound. He continued, that he and the others present, were advised that the shrinkage in the butter was not caused by the packer, but rather by protracted storage at the retail level before the butter was exposed for sale with a consequent loss of moisture. He added that he dated his packages of butter and had not retained any for a period of more than eight days immediately prior to the time he received the summons herein. He stated that he called Boyal Dairy, his distributor, and advised them of the substance of the meeting and told them to make certain that the butter was right, but that later events indicated that things did not turn out quite that way. Mr. Tantleff went on to say that he was present when the Nassau County inspectors arrived on September 20, 1966, and that there was a scale located between the produce department and the self-service cold-cut counter, but that the inspectors advised him there should be a separate scale for customers to use. *142 He conceded that the butter which the inspectors were weighing on September 20,1966, was obviously being offered for sale.
August W. Weidner, Jr., Assistant Nassau County Sealer, on August 16,1966, testified that he was present when the signatures were affixed to People’s Exhibit No. 1, and stated during the course of his voir dire that those present were asked, in substance, “ Would you please sign the attendance roster? ”. Mr. Weidner said that Mr. Williams, the County Sealer, addressed the meeting, speaking from prepared remarks, and advised those present that between January 1, 1966, up to the date of the meeting itself, his inspectors had checked over 35,000 pounds of butter and found in excess of 10% thereof short weight — that his inspectors had visited butter packers and wholesalers and short weights were being caused by the retailers’ representatives in the handling of the butter at the retail stores. The County Sealer advised those present that he would allow them until September 1, 1966, to clean house or the alternative would be that a program of prosecution would be accelerated. This witness also addressed the meeting briefly and was followed by the remarks of two' representatives from Suffolk County, namely, the Suffolk Sealer and one of his senior inspectors. Mr. Weidner, during his cross-examination stated that it was the opinion of the County Sealer that shrinkage or shortweight in butter found on retailer’s shelves was being caused between the time the butter was packaged and its use by the retailer — that the packer places a code on the butter wrapper by perforation which indicates the date of cutting of the butter and its wrapping, and that this was the means by which his department inspectors ascertain that butter was not being exposed for sale until several weeks after cutting and packaging. He added that no short weights were found at the plant of the packer by his inspectors.
Mr. Stephen Knowlton, an inspector for the Nassau County Sealer, was then called by the People. He testified that he arrived at the store of the defendant, Big Apple, in New Hyde Park, with Inspector John M. Sommer at 10:00 a.m., on September 20, 1966. After identifying themselves to the manager and advising him that they wanted to inspect butter, they proceeded to the butter counter and set up their certified scale, which they checked out with certified standard weights. They then began to weigh butter which this defendant was offering for sale. The witness stated that he and Inspector Sommer found 131 packages of butter underweight consisting of the following (see superseding information):
*143 Label Marked Packages Actual Wgt. Butter — “Hotel Bar”, brick............. 35 15 7/8 ozs. « 9 15 3/4 “ Butter — “Royal Dairy”, 4 quarters______ « 40 15 7/8 “ « 5 15 3/4 “ ti 1 15 5/8 “ Butter — “Hotel Bar”, 4 quarters......... « 3 15 15/16 “ a 24 15 7/8 “ u 1 15 5/8 “ Butter— “Hotel Bar”, whipped sweet..... 8 ounces 7 7 3/4 “ a 6 7 5/8 “ After leaving the defendant Big Apple, they went to the premises of the defendant One Eleven South St. No. 2, Inc., doing business as Food Town, and pursuing the same general procedure found 212 packages of butter under weight consisting of the following (see superseding information): Label Marked Packages Actual Wgt Butter— “Food Town”, brick............ 1 pound 53 15 7/8 ozs. a 55 15 3/4 “ a 12 15 5/8 “ Butter— “Food Town”, 4 quarters....... a 39 15 7/8 “ a 42 15 3/4 “ a 11 15 5/8 “
(To put it somewhat euphemistically a total of 343 underweight packages is hardly de minimis.)
The witness Knowlton further testified that while on the premises of the defendant, Food Town, he saw no customer’s scale at any place where food was available for purchase, although he did see a scale a short distance from the room where meat was prepared for sale. He added, that a scale was brought from another room from behind a door where no customers were permitted but that there was nothing indicating it to be a customer’s scale.
On the subject of the scale, there was further testimony to the effect that there was a scale in the produce department.
Mr. Knowlton was cross-examined as to the manner in which the weighing of the butter was accomplished and with respect to whether or not the scale near the meat counter could have been used by customers in the Food Town store.
The next witness called by the People was John M. Sommer, an Inspector for the Nassau County Sealer. He testified, in substance, that he had, during the course of his experience, weighed thousands of pounds of butter and that the weight of a tear (the thin sheet of paper which constitutes the wrapper of butter) averages approximately one quarter of an ounce. *144 He stated that the tears used during the inspections involved in these prosecutions had been weighed at his laboratory by him prior to the inspection of the defendant’s butter and that the variance between tears was a hair, namely, that it was so minute it would not show on his scale.
At the conclusion of Mr. Sommer’s testimony the People completed the presentation of its ease and after the defendants’ motions to dismiss upon several grounds were denied, the testimony of the defendants ’ ensued.
The defendant Big Apple called Nathan Umen as its only witness. He testified that he had been a dairy buyer for said defendant for 3 years last past and for Smilen Brothers for approximately 15 years prior thereto. That he had spent a total of approximately 25 years in the dairy field. He stated that the defendant Big Apple did not maintain a warehouse for butter in 1966 and that each department manager of each store ordered butter twice each week from a dealer by the name of Boyal Dairy — that butter remained in the stores of this defendant a maximum of three days and that approximately three to four hundred pounds of butter were sold each week at the New Hyde Park store where the charge against the defendant Big Apple originated. Mr. Umen added that in September, 1966, his employer made its butter purchases from Boyal Dairy, a dealer in Elizabeth, New Jersey — that in August and September, 1966, Big Apple did not speculate in price fluctuations of butter and, indeed, never did so. He indicated that there was a profit margin mark-up of approximately 5 to 5y2% over what he pays for butter and that it would take approximately one hour per ease to take out each package of butter and weigh it before placing it on the shelves for sale. That there were approximately 32 to 48 pounds per case and he would have to add about three cents to each pound, exclusive of mark-up, in the event that a dairy clerk was required to weigh each pound before it was exposed for sale. This witness said that he made purchases for all the Big Apple stores but that he had no knowledge of the source of the butter in the New Hyde Park store on September 20, 1966, when this summons was issued. He further stated that he is familiar with shrinkage in butter and knows that butter loses water but in his experience he had no way of ascertaining that the consumer actually receives one pound of butter. He said that he never heard of the practice of a butter packer cutting a “ little over the pound.” He concluded his redirect testimony by stating that after issuance of the summons herein he did ask his supplier for a little more butter on the pound, and added that his employer *145 does not make money on butter because it is an accommodation item to the customer and is, in effect, a loss item despite the mark-up of approximately 5%. At the conclusion of Mr. Umen’s testimony the defendant Big Apple rested.
The defendant Food Town then called as its first witness a Mr. Jacob Bernstein who testified that he was the attorney for the defendant Food Town. He described himself as general counsel to said defendant and stated that he had taken photographs the very morning of his testimony, in April, 1967, which indicated a condition no different from September 20, 1966, the day on which the summons had been issued to his client. He testified, “with almost exact” certainty that the scale had been in the position shown on the photographs, since September 20, 1966, at 1:45 p.m., stating, “as certain as he can be,” that the scale was there on the day in question, although he had no independent recollection of being in the store that day.
The defendant Food Town called as its next witness Mr. Irwin Tantleff, the president of said defendant, who testified that the scale on September 20, 1966, and prior thereto was at the location as shown on the photos in evidence. Mr. Tantleff went on to say that the selling area of the defendant Food Town was approximately 10,000 square feet and that the scale as shown on the photos was about 4.0 to 50 feet from the dairy counter where butter was purveyed. He added that Food Town received butter twice each week. This witness further stated that after the meeting at the County Sealer’s office, he had contacted Boyal Dairy (his butter dealer) and told them of his concern for butter weights, as well as of what had transpired at the meeting. He testified that he returned to his store after the meeting and set up a system of dating deliveries of all butter to insure that he would not have butter in the store for more than one week. He concluded his testimony by stating that the defendant Food Town did not keep butter more than seven or eight days. At the conclusion of his testimony the defendant Food Town rested.
The People recalled as its first rebuttal witness Inspector Sommer who testified that at the premises of the defendant Big Apple he had checked:
(a) Fifty-six packages of “ Hotel Bar ” brand brick butter — that he found 12 correct weight — none overweight — the remaining 44 underweight.
(b) Sixty-one packages of “Boyal Dairy” brand 4 quarters— that he found none overweight —15 correct weight — 46 underweight.
*146 (c) Thirty-nine packages of “ Hotel Bar ” brand 4 quarters — found 2 overweight — -9 correct — and the remaining 28 underweight.
(d) Fifteen packages of 1 ‘ Hotel Bar ” brand whipped butter — found 2 correct — 13 underweight.
At Food Town’s premises he weighed 121 packages of “ Food Town ” brand brick butter and found none overweight — 1 correct —120 underweight.
In addition, he weighed 92 packages of “ Food Town ” brand 4 quarters — found none overweight — none correct — 92 underweight.
After being shown the defendant Food Town’s Exhibit A, (the photographs), Inspector Sommer said that he had seen the ¡scale shown in said exhibit on September 20,1966, at the location indicted, but that there was a Food Town employee behind the scale at the time weighing produce. He added that the female employee stepped aside when he checked the accuracy of the scale.
At the conclusion of Inspector Sommer’s rebuttal testimony the People and both defendants rested.
The defendants then renewed all motions made at the conclusion of the People’s case and moved further to dismiss upon the ground that the People had failed to prove the guilt of the defendants beyond a reasonable doubt. Decision was thereupon reserved upon all motions, as well as upon the entire case, with each side being afforded the requested opportunity to submit briefs.
The Statutes
Each of these defendants was charged originally with violations of section 435 of the Penal Law, but the respective informations were amended upon the People’s motions at the onset of trial so as to allege violations of section 189 of the Agriculture and Markets Law ( short weight) in place and stead of section 435 of the Penal Law. In addition, the defendant Food Town stands accused of a violation of subdivision 5 of section 193 of the Agriculture and Markets Law (nonavailability of a scale to customers).
So that we may be transparently clear as to the statutes, which intrinsically concern us, I will designate them as follows:
(a) Section 3 of the Agriculture and Markets Law declares the legislative purpose in enacting that entire statute, when it states under the heading of ‘ ‘ Declaration of policy and purposes ’ ’ in its last paragraph:£ £ Such laws and all governmental measures adopted pursuant thereto should receive a liberal *147 interpretation and application in furtherance of the aforesaid policy and purpose.” (Italics supplied.)
(b) Section 189 of the Agriculture and Markets Law: 11 False labels. No person shall, with intent to defraud, put upon an article of merchandise or upon a cask, bottle, stopper, vessel, case, cover, wrapper, package, band, ticket, label or other thing, containing or covering such an article, or with which such an article is intended to be sold, or is sold, any false description or false indication of or respecting the number, quantity, weight or measure of such article or any part thereof; or sell or offer or expose for sale an article which to his knowledge is falsely described or indicated in any of the manners or in any of the particulars above specified.”
(c) Subdivision 5 of section 193 of the Agriculture and Markets Law: ‘ ‘ Wherever food or food products are packaged or wrapped for sale by a retailer in advance of being sold or offered for sale, an accurate computing scale shall be maintained so placed as to be easily available to customers.”
(d) Section 41 of the Agricluture and Markets Law states that any person who violates any of the provisions of the Agriculture and Markets Law is guilty of a misdemeanor.
(e) In addition to the foregoing, the language of section 43 of the Agriculture and Markets Law entitled “ Evidence ” is most germane. It reads: ‘ ‘ The doing of anything prohibited by this chapter shall be evidence of the violation of the provisions of this chapter relating to the thing so prohibited, and the omission to do anything directed to be done shall be evidence of a violation of the provisions of the chapter relative to the thing so directed to be done. The intent of any person doing or omitting to do any such act is immaterial i/n any prosecution for a violation of the provisions of this chapter. Any person, who suffers, permits or allows any violation of the provisions of this chapter in any room or building occupied or controlled by him, shall be guilty of such violation and liable accordingly. Any person who shall keep, store or display any article or product, the manufacture or sale of which is prohibited or regulated by this chapter, with other merchandise or stock in his place of business, shall be deemed to have the same in his possession for sale.” (Italics supplied.)
Question's of Law
(1) Must the People plead and prove intent to defraud and actual knowledge in order to achieve a successful prosecution of an alleged violation pursuant to section 189 of the Agriculture and Markets Law?
*148 (2) Are the provisions of subdivision 5 of section 193 of the Agriculture and Markets Law so vague and indefinite as to warrant it being found unconstitutional!
The People contend, in distillation, that pursuant to the proscriptions of the Agriculture and Markets Law a seller of food stuffs is liable when a short-weight item is exposed and offered for sale to a consumer, period. They urge that the preponderance of Federal, as well as State law holds that a lack of knowledge or intent on the part of the seller will not enable him to successfully avoid conviction for violation of this nature. They further advance and adhere to a premise best described as, “ let the seller beware,” and urge that lack of proof of guilty intent is of no matter. (See 36A C. J. S., Food, § 22, p. 859.)
The defendants, on the other hand, make the thrust that section 189 of the Agriculture and Markets Law constitutes an exception to the general no intent requirement of the Agriculture and Markets Law, and maintain, that since section 189 says in hoc verba: “ No person shall, with intent to defraud ” (italics supplied), that intent must therefore be pleaded and proven beyond a reasonable doubt in order for them to be found guilty of the crimes charged.
It is by now well settled to the point of virtually being axiomatic that when embarking upon the construction of a statute the intent [sic] of the Legislature as well as the purpose of the law are to be looked for (italics supplied). (People ex rel. Killeen v. Angle 109 N. Y. 564.) “ Our duty is to search out the intention of the Legislature and to give effect to it when discovered though the expression be imperfect ”. (Cardozo, J., 103 Park Ave. Co. v. Exchange Buffet Corp., 242 N. Y. 366, 374.) In addition, the design of the Legislature must be given effect though such a construction seems contrary to the letter of the statute. (See Allen v. Stevens, 161 N. Y. 122,145.) See People ex rel. Jackson v. Potter, 47 N. Y. 375, 379, wherein Judge Folgeb, speaking for a unanimous court said: ‘‘ The intent of the law-maker is to be sought for. When it is discovered, if is to prevail over the literal meaning of the words of any part of the lato. And this intent is to be discovered, not alone by considering the words of any part, but by ascertaining the general purpose of the whole, and by considering the evil which existed calling for the new enactment, and the remedy which was sought to be applied. And when the intent of the whole is discovered, no part is to be so construed as that the general purpose shall be thwarted, but all is to be made to conform to reason and good discretion. (Id.) And the same rules apply to *149 the construction of a Constitution as to that of a statute law.” (Italics supplied.)
Although, penal statutes generally are, of course, to be strictly construed against those who seek to invoke them, nevertheless, where they are remedial in nature and enacted for the public good, they should be equitably construed in order not to defeat their general as well as specific purpose. (See Cotheal v. Brouwer, 5 N. Y. 562, 567; People v. Bartow, 6 Cow. 290, 291, 293; People v. Abraham, 16 App. Div. 58, 61. Nor should they be construed so as to render them sterile or ineffective. People v. Crossman, 241 N. Y. 138, 145. See reference to the foregoing in People v. Minowitz, 13 N. Y. S. 2d 937, 939, 940.)
Since we must necessarily embark upon an endeavor to ascertain the legislative intent when section 189 of the Agriculture and Markets Law was enacted, what better source to refer for guidance than the trenchant thoughts so transparently illumined by Mr. Justice Cardozo in his ageless and indeed priceless work, “ The Nature of the Judicial Process ” wherein he says (pp. 14-15): “ Where does the judge find the law which he embodies in his judgment? There are times when the source is obvious. The rule that fits the case may be supplied by the constitution or by statute. If that is so, the judge looks no farther. The correspondence ascertained, his duty is to obey. The constitution overrides a statute, but a statute, if consistent with the constitution, overrides the law of judges. In this sense, judge-made law is secondary and subordinate to the law that is made by legislators. It is true that codes and statutes do not render the judge superfluous, nor his work perfunctory and mechanical. There are gaps to be filled. There are doubts and ambiguities to be cleared. There are hardships and wrongs to be mitigated if not avoided. Interpretation is often spoken of as if it were nothing but the search and the discovery of a meaning which, however obscure and latent, had none the less a real and ascertaining pre-existence in the legislator’s mind. The process is, indeed, that at times, but is often something more. The ascertainment of intention may be the least of a judge’s troubles in ascribing meaning to a statute. The fact is,’ says Gray in his lectures on the ‘ Nature and Sources of the Law,’ ‘ that the difficulties of so-called interpretation arise when the legislature has had no meaning at all • when the question which is raised on the statute never occurred to it; when what the judges have to do is, not to determine tvhat the legislature did mean on a point which was present to its mind, but to guess what it ivould have intended on a point not present to its mind, if the point had been present. ’ ’ ’ (Italics supplied.)
*150 With, the foregoing borne well in mind, it is the considered conclusion of this court that the Legislature did not intend and would not have intended, to make section 189 of the Agriculture and Markets Law a statutory enclave in the Agriculture and Markets Law by constituting it the only section in that entire statute which required intent to be pleaded and proven. When it was transposed from section 435 (subds. 1, 2) of the Penal Law into section 189 of the Agriculture and Markets Law it bowed to the philosophic rationale of the entire statute, a portion of which is expressed in section 43 thereof. It became ‘ ‘ a piece of the whole — a part of the main. ’ ’ In my view, all that the Legislature sought to accomplish was simply to expunge from the Penal Law a provision which manifestly and properly belonged in the Agriculture and Markets Law. In the process of transference it could not in all good conscience have intended to alter a part of a law of this nature without regard for the entire. Some may see the law, leaf by leaf — others, branch by branch — I prefer to view it as a whole. To do otherwise would simply eviscerate enforcement of section 189 and negate the premise that this law was drawn to fit the situations it was meant to serve. (See People v. Sheffield Farms, 206 N. Y. 79; People v. Swift & Co., 286 N. Y. 64, 70; People v. McMahon, Inc., 191 Misc. 68; People ex rel. Goldberg v. B. M. Reeves, Inc., 168 Misc. 70; People v. West, 106 N. Y. 293; People v. Kibler, 106 N. Y. 321.)
Section 189, Avhile penal in its nature, concerns itself with products which are exposed to the public for sale, and section 275 (McKinney’s Cons. Laws of N. Y., Book 1, Statutes) proAddes that1 ‘ Similarly, statutes which prescribe a penalty for the good of the public are not given the strict construction generally accorded penal laws. * # * a statute beneficial to the public, though penal as to some persons, Avill receive an equitable construction.” (See Cotheal v. Brouwer, supra.)
The latter portion of section 189 which deals with 1 ‘ knowledge ” that a product is falsely described, may be treated in the same manner as any other fact which may be shown by proof of circumstances from which knowledge may be inferred. (See People v. Shapiro, 6 A D 2d 271.)
Whether or not knowledge is to be imputed to these defendants beyond a reasonable doubt is for the court to determine based upon the testimony and exhibits adduced during trial, and such scienter has been abundantly established by the People in this case. The entire question of falsity of weight was, to say the least, somewhat forcibly brought to the attention of the defendants during the course of the meeting at the County Sealer^s office prior to the issuance of the summonses against *151 them and they were also advised of the manner in which the condition complained of could be corrected. They were even afforded a reasonable opportunity to effect such correction.
It is no defense for the defendants to urge that they did not prepare or package the butter themselves. It is incumbent upon them to know the contents of the merchandise they proffer for sale. They were not engaged in isolated transactions, but rather in a continuing series of dealings taking place virtually every hour of every business day in open consort with the public.
The realities in the realm of human affairs are human beings and the relations with each other into which they enter. The source of every action is some individual person and virtually every human action is the product of a previous act of choice. Indeed, the power to make choice is the monopoly of human personality. The defendants were forewarned, and it was not their choice, but rather their responsibility to provide their customers with what the packages called for! I can put it no more simply than that! Old customs curtsy before new circumstance!
It is my holding with respect to the availability of the scale for customers which pertains only to the defendant Food Town, that in order to comply with subdivision 5 of section 193 of the statute, a scale must be: (1) plainly visible, (2) front to the public, and (3) reasonably proximate for public use. These are standards to which reasonable men can with propriety repair, and this defendant, upon the evidence did not comply with either the letter or the spirit of the statute. The language of this statute is not so vague and indefinite as to warrant rendering it unconstitutional.
I have no reluctance in adding, that were I to have found proof of intent to be a necessary ingredient to successful prosecution, the by now self-evident result would have been the same. So that there need not be a residue of doubt concerning the ratio decidendi by which this latter conclusion has been achieved, the “ totality ” of the evidence supplies the source, namely, the meeting — the notice — the suggested remedy — the warning— the opportunity to correct — the not miniscule 343 packages underweight.
The defendants’ claim of inconvenience due to the need for additional employees to check all butter offered for sale, of greater expense for additional employees, or of loss of profit, are not effective responses to the necessity for strict compliance with a statute of this nature. Their concerns to the contrary, there will be no apocalypse in the supermarket resulting from *152 an adverse decision herein, Patience in the pursuit of proper poundage is no vice.
As fate would have it, our Court of Appeals, speaking through Judge Werner in People v. Sheffield Farms (206 N. Y. 79, 81, supra) had, of all things, a butter case before it, when it declared that the statute there under review was “not to be construed according to the strict rule of the common law, but in consonance with ‘ the fair import of [its] terms, to promote justice and effect the objects of the law.’ ” The court went on to say that, ‘ ‘ The term ‘ knowingly ’ imports a knowledge that the facts exist which constitute the act or omission of a crime, and does not require knowledge of the unlawfulness of the act or omission ’ ’. While I recognize and consequently concede that the question with which the court dealt in the Sheffield ease {supra) was quite different from the case at bar, it nevertheless set its sights and took square aim at the very narrow matter of this and every other comparable prosecution, when it said (pp. 82-83): “ The statute deals generally and compresensively with the subject of weights and measures and its purpose is to enforce honest dealing by pumshing fraud. It matters not by what particular means this form of cheating may be carried on. In one case it may be by the use of light-weighted scales, or undersized measures, and in another it may be by the delivery of light weight or short measure without the the use of any visible standard. In every case the purpose of the statute is to reach intentional shortage in weight or measure without regard to the specific means by which this despicable hind of fraud may be sought to be accomplished.” (Italics supplied.) This luminous language moves me to say that the less further said is the best said.
I might add parenthetically, that I reject the argument advanced by the defendants to the effect that the meeting of August 23, 1966, and its attendance roster was violative of their constitutional rights pursuant to Miranda v. Arizona (384 U. S. 436). Mr. Chief Justice Warren crystallized the meaning of Miranda when he said (pp. 477-478): “ The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of Ms freedom of action in any way. # * * To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities and is subjected to questioning, the privilege against self-incrimination is jeopardized.”
*153 For reasons too apparent to enumerate, neither attendance at that meeting nor the signing of the roster falls within the purview of the foregoing.
The defendants’ motions addressed to the sufficiency of the informations herein, as well as their motions to dismiss upon the merits are in all respects denied, with exceptions in each instance. The People have proven the guilt of the defendants beyond a reasonable doubt, and I accordingly find them guilty upon all counts charged in the respective informations. I accordingly fine each defendant the sum of $200 for their violations of section 189 of the Agriculture and Markets Law, and, the defendant Food Town the additional sum of $100 for its violation of subdivision 5 of section 193 of the Agriculture and Markets Law. The foregoing fines are to be paid to the Clerk of this court within 10 days from the date hereof.